Before EDMONDS, Circuit Judge, and two Aldermen.

### THE PEOPLE v. WILLIAM HARPER.

*If, on cross-examination, it shall appear that the witness has not the moral sense requisite to make him a competent witness, the court may, in its discretion, strike out his testimony or leave it to the jury with proper instructions as to its due weight.*

*When a fatal blow is struck in self-defense, the homicide will not be justifiable unless the perpetrator has first retreated as far as he could.*

*Though it may not make it justifiable, it will at all events be proper to consider it in order to determine whether there was an intention to kill, thus making the offense murder; or merely a purpose to get free from overpowering violence, thus making it manslaughter.*

INDICTMENT for the murder of George Kempf. K. was a German, about twenty-eight years old, very large and stout. He worked at his trade of wheelwright. His wife, who was also a German, kept a liquor store, an eating room, and boarding-house where lewd women resorted. The prisoner was an Irishman, and lived in the neighborhood, and occasionally frequented that store.

All the parties were in the habit of getting drunk.

In June, 1845, the prisoner got into a quarrel with Mrs. K., and was turned out of the store by the deceased, at which he was so angry that he told Mrs. K. he would have her husband's life in two weeks.

One night, near the latter end of October following, and after ten o'clock, several persons were in the store drinking, when a man in a state of intoxication rode into the store on horseback and insisted upon treating all that were present. His horse was taken out of the store two or three times, and between the second and third times of his riding him into the store the prisoner went in and joined the company, drank, and sang several songs. The attempt to get the horse out the third time caused a disturbance, in the course of which the prisoner

struck the deceased a blow in the face with his fist, and then, according to some of the witnesses, he was put out of the store by Mrs. K., and according to others he ran out of his own accord.

The disturbance had gathered a number of people around the house who were looking in through the windows, and among them the prisoner. Mrs. K. was then in the bar-room and her husband in the back room, seated at a table where customers were eating. She went into the back room and said something to him, in consequence of which he got up and went out into the street. She and some others testified that what she said was that she "was afraid they would break the windows, and he had better go out and put up the blinds." Others testified that her language was, "There's that damned Irish bugger looking in the window. You go out the side door and lick him like hell."

The store was on a corner, and had two doors. As her husband went out at one door, she went out at the other, and they both went toward the prisoner, who was looking in the window.

Of what occurred there, the evidence was very conflicting. The deceased, in his examination before the coroner's jury, said that he went out to put up the shutters, when the prisoner struck him, and deceased pushed him away, and while doing so he was stabbed in the groin. Mrs. K. testified that K. took hold of the shutters, when prisoner struck him; that then they were clinched two or three minutes, when K. cried out that he was stabbed. Other witnesses testified that K. knocked the prisoner down, and beat and kicked him while down, and that Mrs. K. seized him by the hair of his head and beat him, and that it was during this time K. cried out that he was stabbed. K., in his examination, said he saw the knife in the prisoner's hands, and it looked like an oyster knife.

K. retreated into his store, and the prisoner walked away up the street. Mrs. K. ran after him, seized him, and brought him back. He was very bloody, but the wound of K. bled only internally.

This occurred on a Saturday night, and K. died on the following Thursday.

The characters of the witnesses caused much contradiction in the evidence. All were more or less under the influence of liquor at the time of the affray. Mrs. K.'s character was bad; she was very profane and quarrelsome, was in the habit of drinking, was lewd, herself, and kept lewd women in her house. Frequent disturbances had occurred in her house, until the neighbors had signed a petition to have it indicted, and one of the witnesses for the defense testified, on his cross-examination, that he did not know how old he was, he could not read or write, did not know the meaning of the oath he had taken, had no idea of it at all, had no idea what would become of him when he died, he never went to church, had been to school a little, but had forgot it all since, he had never received any religious instruction, did not know what would happen to him if he lied, he thought he should go to Heaven, believed there was a God who would punish him if he lied, but did not know how he should be punished in this world for lying.

*The District Attorney* moved to strike his testimony out of the case, for want of sufficient intelligence and moral sense to render him a competent witness.

*The Judge* said he was as conscious as the public prosecutor, or the jury, could be of the difficulty of getting at the truth in this case. All the witnesses to the transaction seemed to have been drunk; they all seemed to have taken sides, and to testify rather to what was desired of them than what they knew; none of them seemed to have any regard for the obligation of an oath, and the stories they told of the same incidents were so flatly contradictory to each other, that some of them must of necessity be false, and the general character of several of them had been proved to be bad. The difficulty of administering justice under such circumstances was, to be sure, very great, but the remedy was not by exclud-

The People v. William Harper.

ing them from the witness stand, or by striking out their testimony when their moral unworthiness was discovered.

The effect of that would be to give to this degraded class of our population, an impunity for crime so long as they confined its perpetration to their own wretched localities, or within the knowledge of their own debased associates. No. The only course was to receive the testimony, and do the best that was possible with it. It could not all be false; there must be some truth among it, somewhere, and a patient, vigilant, scrutiny could find it. The motion must be denied.

One witness—he was a brother to the committing magistrate—testified that he once saw the deceased knock his wife down because she had slapped him in the face, and that the next day she had taken out of her bosom a well worn butcher knife, wrapped up in coarse brown paper, had shown it to him and had said to him that the first row she could get her husband into she would take the damned son of bitch's life; that the witness had told her that would be dangerous, and she had replied that some poor devil would be hung for it.

Mrs. K. denied this whole story in the most positive manner, and said she had had a quarrel with the witness because he owed her a dollar and she had refused to trust him any more; and several witnesses swore his character was so bad that he was not to be believed.

Her own character was proved to be as bad, and she had been as positively contradicted in parts of her testimony by other witnesses.

*The Judge* charged the jury that the defense did not set up the theory that it was Mrs. Kempf who had committed the offense, though the excuse for doing so had been afforded by one of the witnesses.

It was palpable that it had been done either by her or the prisoner at the bar, and now the points for the jury were, whether the death had been caused by the wound or by the neglect of the deceased to obey the instructions of his sur-

geon; and whether the blow had not been struck in self-defense, so that even if the homicide was not justifiable, it was at least reduced to manslaughter by the absence of an intention to kill?

As to the first question the jury need have no difficulty. The skilled and respectable surgeons of the hospital had, after a post mortem examination, distinctly stated that it was the wound that caused the death, and it would not do for the jury to adopt any fanciful theory in the place of such explicit and reliable testimony.

But upon the other question there was a good deal of difficulty, and that difficulty was increased, if not caused, by the unreliable character of all the witnesses to the affair, and the very conflicting accounts they had given of it. But this was a difficulty inherent in the very nature of the case, and must always attend the commission of crime among that class of people and in the localities where they herd together; and all the jury had to do was to bring their good sense to bear on the case, and do the best they could with it.

In order to constitute the crime that of murder there must have been an intention to kill. The difficulty of the previous June and the prisoner's threats growing out of it; his striking the deceased in the store on the evening in October, and apparently without any provocation; his lingering around the store after he had fled out of it, instead of going away, and his having so readily at command a fatal weapon, when he and the deceased came together again, all looked that way, as if there might have been such intention, and as if the blow had been given for the purpose of causing death.

But, on the other hand, it might be that the blow had been struck merely to relieve himself from the superior strength of the prisoner and the violent treatment he was receiving at his hands.

Even, however, if this was so, it would not be justifiable homicide, because of the omission by the prisoner of one indispensable requisite — he had not retreated as far as he could from an affray, but on the other hand he had placed himself

directly in the way of one, by lingering, and drawing a crowd around the store.

But though his striking in self-defense might not be justifiable in the eye of the law, and thus exempt him from all punishment for the homicide, still it might show that he struck for the purpose of immediate relief, and not to effect death. In such case the offense would be manslaughter only, because of the want of an element essential to make it murder, namely, an intention to kill. The jury would, therefore, weigh all the testimony carefully, to see whether, in fact, the purpose of the blow was to kill, or to obtain relief from overpowering violence.

In doing this the jury would doubtless have a difficulty, growing out of the character of the testimony. According to the testimony of the deceased and his wife, there was no violence on the part of Kempf for the prisoner to resist. According to the testimony of the by-standers, the blow was not struck until the prisoner was entirely in the power of the deceased, and was being cruelly ill-treated by both him and his wife.

This conflict of evidence was a serious one; the discrepancy in the two accounts is too great to be reconcilable, and there must somewhere be gross falsehood, and not merely different views of the same transaction; and all that could be done was to bring to bear on the question, the exercise of the highest powers of their reason, and an intention to do right and leave the result in the hands of a divine providence.

The prisoner was convicted of murder, and sentenced to be executed.

After the sentence had been pronounced, and before the time of its execution, the following letter was addressed to the Governor:

NEW YORK, January 22, 1846.

To His Excellency, SILAS WRIGHT, Governor of the State of New York—

SIR: The undersigned, judges of the Court of Oyer and Terminer, in the city of New York, at which William Harper was convicted of murder, at the request of his counsel, respectfully represent—

That on the trial of the cause there were two important points involved in some doubt:

1. Whether it was the prisoner who gave the fatal blow; and,

2. Whether that blow was the result of premeditated design, or was given in an affray.

On the first point, the evidence was the most satisfactory, because it was clear that the blow was given either by the prisoner, or by the wife of the deceased, and, as to the wife, her positive evidence, and the absence of motive on her part to commit the offense, left little doubt as to her innocence.

On the second point, the evidence was much less satisfactory.

The question was, had the prisoner availed himself of the interval of twenty or thirty minutes to arm himself, or did he draw the fatal instrument after he got into the affray? If the former, it was murder; if the latter, it was manslaughter. The jury thought it was the former, and therefore convicted him.

We confess we should have been better satisfied with a verdict finding manslaughter, and for the following reasons:

1. It was not impracticable for the prisoner to have drawn the fatal instrument after the affray commenced.

2. No person saw it in his hand before the blow was given, yet he had been standing for some time in a light sufficiently strong to have exposed it, and he had been surrounded by several persons who were near enough to him to have seen it.

3. The deceased was a large and powerful man, much the superior of Harper in strength, and Harper was thrown down and badly beaten in the affray, and it may be that the knife

The People v. William Harper.

was used only after the deceased had begun to put forth his great strength upon the prisoner.

There is, therefore, nothing in the case rendering it certain that the fatal blow was the result of premeditated design. It may have been given under circumstances which would make the crime manslaughter.

There is, however, a still farther element of doubt in the case. There were three young men standing near the parties at the time the affray occurred, in a situation which enabled them to witness it, and in giving their testimony they agreed in representing the deceased and his wife as beginning the affray. This conflicts with the testimony of Mr. and Mrs. K., and the jury were called upon to determine which aspect of the case they should credit, and, by their finding, they discredited the relation of the three young men.

It may be, however, that their relation was true. There is nothing in the case to render it certain that it was not so.

No blame can attach to the jury. They were required to decide between this conflicting evidence, and there was enough in the case to justify their verdict; but it was not in their power to remove this painful doubt from the case — a doubt which must ever render it uncertain whether the crime which the prisoner committed was murder or manslaughter.

It is the existence of this doubt which weighed upon our minds at the time of the trial, and has not yet been removed, which has induced us to yield to the solicitations of the prisoner's counsel, and make this representation to the Executive.

In consequence of this letter, the sentence of the prisoner was commuted to imprisonment for life.

[NOTE.—After such commutation the following facts came to the knowledge of the presiding judge: After one of the witnesses had given his testimony, he was overheard, by one of the officers of the court, to say to the counsel for the prisoner, "You didn't ask me any thing about the knife." To which the counsel had replied, "Never mind that." The officer inquired of the witness what that meant? The reply was, that after Harper had struck Kempf, and fled from the store, he ran up home, which was only a

short distance off, and very soon returned.   After his return, the witness saw Harper in front of the store, cutting with a knife into a post, and evidently in a good deal of anger, and on witness asking him what he was doing there, he had answered he was going to have that damned Dutchman's blood.   There was no evidence given of this on the trial, nor any intimation, even to the court or jury, that such evidence could be given.]

## NEW YORK CIRCUIT—AT CHAMBERS.
### DECEMBER, 1845.
Before EDMONDS, Circuit Judge.